**FEDERAZIONE ITALIANA DEI CONSORZI AGRARI et al., Plaintiffs,**

v.

**MANDASK COMPANIA DE VAPORES, S. A., Defendant.**

**No. A. 91–364.**

United States District Court
S. D. New York.

Dec. 21, 1966.

See also D. C., 223 F.Supp. 206.

Kirlin, Campbell & Keating, New York City, for plaintiffs, Edward L. Smith, Walter P. Hickey, Robert B. O'Neill, New York City, of counsel.

Hill, Betts, Yamaoka, Freehill & Longcope, New York City, for defendant, Eugene F. Gilligan and David C. Wood, New York City, of counsel.

## MEMORANDUM OPINION

CROAKE, District Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a suit in admiralty brought by the owner of a cargo of soybean oil to recover its value following a total loss

sustained when the Panamanian tanker "PERAMA" sank in the Gulf of Mexico on March 18, 1957. The case is here on retrial, having originally been heard by the late Hon. Archie O. Dawson.

At the first trial, Judge Dawson made findings of fact which appear for the most part to be in agreement with our own. These findings were embodied in an opinion dated June 11, 1964,[1] wherein Judge Dawson found the defendant shipowner liable for the loss of cargo, but also found that it could limit its liability pursuant to § 183(a) of Title 46, United States Code. An interlocutory decree relating to proof and recovery of damages was entered on June 23, 1964, from which an appeal was taken to the United States Court of Appeals for the Second Circuit.

The defendant appealed from the decree as to liability, and the plaintiffs cross-appealed with respect to the issue of limitation.[2] The Court of Appeals reversed as to both issues and remanded the case for a new trial.[3]

The retrial, though lengthy and complicated, was well-conducted by experienced attorneys. As at the first trial, a good part of the evidence presented on the issue of liability was concerned with the defendant's effort to establish the exception of fire. In addition, a substantial body of evidence relating to unseaworthiness was presented, both in direct support of the plaintiffs' theory of unseaworthiness, and in opposition to the defendant's theory of fire. Evidence bearing on the issue of due diligence, and on the issues of knowledge and privity, was also presented and carefully considered by the court in arriving at its findings and conclusions.

The court now delivers its opinion and decision, which opinion shall constitute its findings of fact and conclusions of law.

As noted at the first trial, many of the essential facts were stipulated not to be in dispute by a pretrial order filed on August 9, 1963. It is stated therein that the plaintiff Federazione was the owner of a shipment of soybean oil to be shipped aboard the tank vessel "PERAMA" by the Interoceanic Commodities Corporation, charterer by virtue of a charter party between itself and the owner of the "PERAMA"; that the bill of lading was negotiated by the shipper to the plaintiff; that the tank vessel "PERAMA" was owned and operated by the defendant; that the cargo was loaded aboard the "PERAMA"; that the "PERAMA" departed from Baton Rouge with plaintiff's cargo on board on March 15, 1957; and that on March 18, 1957 the "PERAMA" sank and became a total loss with her cargo.

■ On these stipulated facts, a prima facie case is established, entitling the plaintiffs to recover unless the defendant can establish a defense provided by law.[4] The defendant's answer to the amended complaint alleges several affirmative de-

---

1. Reported at 1965 A.M.C. 928 (S.D.N.Y. 1964).

2. The plaintiffs also cross-appealed from a denial of their motion to require the defendant-shipowner to furnish security. The Court of Appeals affirmed as to this issue, and the matter is not before us now.

3. Reported at 342 F.2d 215 (2d Cir. 1965) and 1965 A.M.C. 921 (2d Cir. 1965).

4. Under the general prestatutory law as well as under the Harter Act and COGSA, a shipper can make out a prima facie case for recovery by proving loss of goods, or damage to goods, while in the hands of a public carrier. Under recent cases, proof of delivery to the carrier in good order and receipt in bad order or non-receipt places the burden of explanation on the carrier. For a discussion of this topic, see Gilmore & Black, The Law of Admiralty 162–163 (1957) and cases cited therein, especially American Tobacco Co. v. The Katingo Hadjipatera, 81 F.Supp. 438, 445 (S.D.N.Y. 1948), aff'd, 194 F.2d 449 (2d Cir. 1951), cert. denied, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952). In the instant case, delivery of the cargo in good order as well as its loss due to the sinking of the "PERAMA" are unquestioned, so that the plaintiffs in this case have made out a prima facie case for recovery.

fenses based upon the terms of the charter party, and upon certain statutory provisions, all of which shall be taken up below. In addition to its complete defenses, defendant offers the partial defense of limitation of liability.

The several issues calling for resolution can be stated in outline form as follows:

1) Timeliness of suit;

2) Liability;

3) Limitation of liability.

### 1. *Timeliness of Suit.*

Neither party appealed from the determination of Judge Dawson as to timeliness of suit. His discussion of this issue took into account and resolved the question of corporate capacity to sue, as well as the validity and relation back of an amendment adding the name of the president of the plaintiff Federazione as a party plaintiff. His conclusions appear to be complete and correct. Upon careful consideration, it seems that little purpose could be served by re-formulating them. In the interest of orderly procedure, we expressly adopt and incorporate by reference that portion of the opinion of Judge Dawson dealing with these matters,[5] and concur in his finding that the suit was timely and properly brought.

### 2. *Liability.*

The gist of the plaintiffs' position is that the "PERAMA" sank because of the entry of seawater through cracks in her hull which opened as the result of unseaworthiness, and that the defendant is liable for the loss of cargo because of its failure to exercise due diligence to make the ship seaworthy.

The defendant's position may be summarized as follows. It denies that the loss was due to unseaworthiness, and asserts that, at any rate, it exercised due diligence to make the ship seaworthy. In keeping with its denial of loss through unseaworthiness, the defendant urges that the loss was due to one of the statutorily excepted provisions and claims, specifically, that the loss was the result of fire, caused neither by its actual fault or privity, nor by its design or neglect.[6]

---

5. See 1965 A.M.C. 928 at 936–938.

6. Among the statutes relating to the asserted positions of the parties is the Carriage of Goods by Sea Act (COGSA), 46 U.S.C., §§ 1300–15, especially the following sections:

"§ 1303. Responsibilities and liabilities of carrier and ship.

(1) Seaworthiness.

The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—

(a) Make the ship seaworthy;

(b) Properly man, equip, and supply the ship;

(c) Make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation.

\* \* \* \* \*

"§ 1304. Rights and immunities of carrier and ship.

(1) Unseaworthiness. (Actually denoted as "(a)" instead of "(1)," but the scheme of the statute indicates that "(1)" was intended.)

Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, \* \* \*. Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.

(2) Uncontrollable causes of loss. Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

\* \* \* \* \*

(b) Fire, unless caused by the actual fault or privity of the carrier.

\* \* \* \* \* "

Also relevant is the Fire Statute, 46 U.S.C. § 182:

"§ 182. Loss by fire.

No owner of any vessel shall be liable to answer for or make good to any person any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner."

As far as the burden of proof is concerned, it has been observed above that the stipulated facts make out a prima facie case for the cargo owner. The carrier, however, has not remained silent. It has properly assumed its burden of explaining the loss and has endeavored to demonstrate to the court that the loss was due to fire, in that the "PERAMA" sank because of a fire-induced explosion.[7] The plaintiffs have countered with proof opposing the defendant's fire theory, attempting to show, both negatively, that the sinking of the ship was not the result of fire, and affirmatively, that it was the result of unseaworthiness caused by want of due diligence.

The facts leading up to the sinking of the "PERAMA" have been established. The "PERAMA" was built in 1936 for the American Oil Company. It was taken out of service and laid up in Jacksonville, Florida, in 1954 in a rusted and deteriorated condition. It was purchased by the defendant in 1956 and towed to the yard of the Alabama Shipbuilding and Dry Dock Company at Mobile, Alabama, for repairs and renewal work.

Upon completion of the repairs, the vessel made a voyage to England to deliver a cargo of gas oil, returning to New Orleans on March 9, 1957. Upon her return she was found to have developed cracks in the renewed portion of the transverse bulkheads in certain of her cargo tanks. Repairs were made at the Todd Shipyard in New Orleans, after which the "PERAMA" proceeded to Baton Rouge, Louisiana, where she loaded the cargo of soybean oil in suit. She sailed from Baton Rouge on March 15, 1957, proceeding down the Mississippi River until forced to anchor for repairs when her steering gear failed. She got under way again on March 16 and continued down the Mississippi River into the Gulf of Mexico until the afternoon of March 17, when her lubricating oil pump serving the propulsion engines malfunctioned. Despite the resulting loss of oil pressure, the propulsion engines were left running, and were shut down only after several ineffectual attempts to correct the malfunction. Subsequent attempts to repair the lubricating oil pump and restart the engines were unsuccessful. When it became apparent that repairs could not be accomplished at sea, communications with shore were made to arrange for the dispatch of a tug.

At 1:30 a. m., on March 18, a loud noise was heard, and smoke and flame were observed coming from the "PERAMA'S" pumproom and from her aft cofferdam. The crew played hoses on the bulkheads of the affected compartments and introduced $CO_2$ gas into them to smother the fire. The master's log indicated that the fire was out at 2:40 a. m.

At 3:15 a. m., a second loud noise was heard. This second noise was unaccompanied by any flame or flash of light, and with no disturbance of the smoke spirals coming from the compartments as a result of the earlier fire. No new effusion of smoke was observed. After this second noise, which was described by observers as being an explosion, the Chief Mate went down to inspect the cofferdam and pumproom. The engine room had reported that water was pouring in from the bottom near the forward bulkhead. The engineering officers and the Chief Mate testified to seeing a breach on the forward port side of the engine room, and a great quantity of water coming up from the underpart of the engine room. A second crack was also observed in the forward bulkhead of the engine room, with oil and water coming through. In addition, after daylight, the Captain observed

---

7. A successful showing on this point would, under 46 U.S.C. § 182, note 6, supra, require exoneration from liability unless it were shown that the fire was caused by the "design or neglect" of the defendant. Similarly, under 46 U.S.C. § 1304(2) (b), note 6 supra, the defendant would be entitled to exoneration unless the fire were caused by its "actual fault or privity."

cargo oozing from a crack in the deck in the forward part of the ship.

A first attempt by the cargo ship "CLAIBORNE" to tow the "PERAMA" failed when the towing lines parted. After the second tow began, the "PERAMA" began to sink rapidly by the stern with the bow going up in the air. The "PERAMA" sank in a calm sea at 4:30 p. m., March 18, 1957. Whether or not the "PERAMA" sank as a result of an excepted cause is the primary fact issue in this case.

Until shortly before sinking, the vessel appeared to be settling on almost an even keel. During the night she settled until her decks amidships were nearly awash. Photographs taken from the Coast Guard aircraft and from the "CLAIBORNE" during the efforts to save the ship depict its condition and situation throughout the day.

█ It is clear from the evidence presented at trial that the cause of the sinking of the "PERAMA" was the flooding of the ship resulting from the entry of sea water through cracks in the hull. The defendant shipowner has attempted to show that the cracks were the result of a fire-caused explosion. Upon careful consideration of all the evidence and the record, including numerous photographic and diagrammatic exhibits, the testimony of experts and eyewitnesses, and a careful review of the transcripts of the testimony, this court finds that the defendant has not satisfied its burden of proof with respect to its attempted demonstration that the loss was due in any part to fire or a fire-induced explosion.

The fire which followed the first loud noise or explosion was not, and is not claimed to be, the immediate cause of the loss. It is the defendant's theory that this fire triggered yet another explosion (the second loud noise) causing the ship to crack and sink.

The evidence of the circumstances aboard ship prior to the alleged explosion does not favor this explosion theory. The testimony of expert witnesses for both parties did not differ appreciably as to the amount of heating that would be necessary to trigger a fuel tank explosion as advanced by the defendant. The conditions that would be necessary to provide the kind of heating required for the fuel tank explosions described at trial were simply not available aboard the "PERAMA."

Expert testimony was heard relating both to the high fuel oil temperatures that would be required for vaporization and ignition, and to the poor heat transfer properties of the pumproom-cofferdam area, where the alleged fire explosions were to have occurred. This testimony combined with the absence of any observations by those aboard ship of the intense heating necessary to establish the conditions favorable to an explosion, all militate strongly against the inferences that would need to be drawn to sustain an explosion theory. The fire that had occurred earlier aboard the "PERAMA" was a relatively small and short-lived one, and gave no indication of being anything but out when the second loud noise was heard.

The absence of post-explosive effects after the second loud noise was heard is yet another factor calling for the rejection of the fire explosion theory. This noise was neither accompanied nor followed by any fire or black smoke that would have attended a fuel explosion. Nor was the damage to the ship characteristic of what would be caused by an explosion. There was observed cracking of heavy structures, but no observed explosive damage or destruction to weak structures, such as the deck in the near vicinity of the supposed point of explosion. In addition, the observed even trim of the vessel prior to sinking would not be accounted for by an explosion localized in the vicinity of the pumproom. The pumproom was located in the aft part of the ship, and an explosion occurring there would be followed by entry of seawater in that part alone. In addition, an explosion aft would not explain ruptures in the forward end of the ship that would, by the accompanying entry of

water forward, account for the even trim. No satisfactory explanation of the ship's trim, consistent with an explosion theory, has been advanced.

The one factor reconcilable with an explosion theory, of the many considered, is the loud noise itself, heard before the large cracks and leaks were observed. However, even this factor is at best merely consistent with an explosion theory and does not serve to promote the theory over others with which it is at least equally consistent. In particular, testimony as to the intensive explosive noise accompanying the cracking of a plate the size of a ship's plate provides a ready alternative to the explosion theory as a means of accounting for the loud noise. Moreover, this alternative, unlike the fire-explosion theory, is not at odds with a host of other factors, such as the absence of explosive pre-conditions and after-effects. All the circumstances accompanying the hearing of the loud noise are completely in harmony with the plaintiffs' theory of plate-cracking,[8] and there is no question about the fact that cracking was observed.

In the absence of the necessary preconditions for, and the normally ensuing and therefore expected results of, an explosion of the type advanced by the defendant, the presence of a loud noise at best consistent with such an explosion theory is not persuasive. This court finds that the loss of the "PERAMA" and the cargo in suit was in no part the result of any fire or fire-induced explosion.

In the light of this finding, it becomes unnecessary to consider, for purposes of section 182 and 1304(2) (b), of Title 46 of the United States Code, questions of "design or neglect," or "actual fault or privity" with respect to fire.

The foregoing conclusions, without more, would call for a judgment for the plaintiffs. The defendant's failure to demonstrate that the loss of the "PERAMA" was due in any part to fire leaves the loss of her cargo unexplained, and the presumption of unseaworthiness in favor of plaintiffs' recovery unrebutted. However, the state of the evidence is such that the court is not compelled to rely solely on this presumption. A portion of the plaintiffs' evidence, introduced primarily to negative the defendant's explosion theory, has affirmative bearing on the issue of unseaworthiness. This evidence relates to unseaworthiness in several respects, namely, the reactivation repairs performed at the Alabama Shipbuilding and Dry Dock Company, the voyage repairs performed at the Todd Shipyard in New Orleans, and the manning of the crew. The defendant's efforts to overcome the force of this evidence have not been successful.

The repair and renewal work at the Alabama Shipyard and Dry Dock Company was performed without proper regard for weaknesses and susceptibility to brittle fracture, and resulted in the creation of crack triggers, notches and discontinuities that increased the likelihood of brittle fracture. In certain instances, excessively wasted plates and internals were not renewed. In addition, new plating was welded to older plating without testing to determine the susceptibility of the older plating to brittle fractures.

At the time of the repair work, the greater susceptibility to cracking of welded structures, as opposed to riveted structures, was well known in the industry. During World War II, experience with welded ships (which had just come into wide use) revealed that metal that had been adequate for use in riveted ships was susceptible to brittle fractures under temperature and stress conditions of relatively low severity when used in welded ships. As a result, steel specifi-

---

8. The plaintiffs contend that the loud second noise was the noise created by plate fractures and cracking which occurred as a result of the methods employed in reconstructing and repairing the "PERA-MA," which failed to remedy and even enhanced her susceptibility to brittle features to the extent of leaving her in an unseaworthy condition.

cations were developed to minimize susceptibility to brittle fracture, particularly in welded construction. These specifications were widely known and readily available at the time of the repair work.

Also available, and fairly simple to implement, were means of testing ship's plating for susceptibility to brittle fracture. Nevertheless, the old plates of the "PERAMA," a pre-war ship built in 1936 with riveted shell and deck plating construction, were not tested for sensitivity to brittle fracture. Weakened by wastage, these pre-war metal plates were incorporated by welding into larger areas of welded new plating.

The welding of the new plates to the old, created crack triggers (also called notches or stress concentrators) which increased the likelihood of cracking. Additional crack triggers were created by the process by which rivets were repaired, i. e., by welding new heads on them instead of renewing them. Susceptibility to brittle fracture was further enhanced by the use of certain cropping techniques, which created crack-triggering discontinuities. Finally, no effort was made to adopt measures for preventing the propagation of cracks through the welded configurations, such as, by way of example, the use of crack arrestors.

The failure to adopt measures to prevent crack propagation, while at the same time creating numerous crack triggers in a ship whose hull and internals were in part already excessively wasted and unrenewed, and whose pre-war plating was presumably of pre-war sensitivity and susceptibility to brittle fracture, produced the unseaworthiness that resulted in the eventual sinking and loss of the "PERAMA."

It would be difficult to disregard the fact that, after the first voyage of the "PERAMA" following her renewal at the Alabama Yard, cracking was observed in the transverse bulkheads of several of her cargo tanks, necessitating repairs at the Todd Shipyard in New Orleans.

The evidence of the unseaworthiness of the "PERAMA" is quite persuasive. Upon consideration, it is apparent that defendant has not only failed to establish the exception of fire through proof of its theory of a fire-induced explosion, but has also failed to impede the plaintiffs' steady progress in carrying the claim of unseaworthiness beyond the area of legal presumption, and into the domain of evidentiary proof. On the basis of all the evidence, this court finds that the sinking of the "PERAMA" was the result of unseaworthiness of the vessel resulting in the opening of cracks in her hull, and permitting the ingress of water which eventually caused her to sink.

Having found that the loss of the "PERAMA" with its cargo was due to unseaworthiness, attention must now be directed to the defendant's reliance on 46 U.S.C. § 1304(1) providing that liability shall not attach "unless caused by want of due diligence" respecting seaworthiness. The defendant alleges due diligence in performing the repair and renewal work on the "PERAMA," and attempts to support its allegations by pointing to compliance with recommendations of the American Bureau of Shipping, and subsequent certification by that Bureau. It also relies upon the excellent reputation of the Alabama Shipyard and Dry Dock Company.

The burden of proving due diligence in this regard is, by statute, the defendant's. 46 U.S.C. § 1304(1). The facts to which the defendant refers do not constitute sufficient proof of due diligence. The duty to exercise due diligence respecting seaworthiness is nondelegable and the owner may not avoid its responsibility in this regard by contracting out repair and renewal work. Reliance upon either the American Bureau of Shipping or the Alabama Shipyard and Dry Dock Company does not show that the unseaworthiness of the "PERAMA" was not the result of want of due diligence for which the defendant is responsible. The opinions or reputations of others do not rule out a want of

due diligence. And since the duty to exercise due diligence to provide a seaworthy ship is non-delegable, a want of due diligence on the part of those chosen to effect the repair work is attributable to the owner. The owner has not shown that the repairs themselves were performed with the kind of diligence that would exonerate it from liability for the ensuing unseaworthiness. Without a satisfactory explanation for any of the elements contributing to the unseaworthiness, including the failure to make certain renewals in excessively wasted platings and internals, the method of rivet repair, the use of cropping techniques, the failure to test for crack sensitivity, or the failure to employ proper safeguards against cracking, the defendant cannot under the circumstances of this case claim to have satisfied its burden of proof. Its defense is primarily one of delegated responsibility and must be rejected.

■ But not only is the defense insufficient at law, it is also unsupported by the facts. The court is satisfied that the continued and active participation[9] in the repair work by corporate representatives, to wit, Mr. Stavraka, a surveyor engaged by the defendant to represent it and to supervise the repair work at the Alabama Shipyard and Dry Dock Co., by Anastassios Sideratos, the defendant's president, and, later, Mr. Kanapaux, the defendant's New Orleans representative, does not square with the attempt to interpose an insulating delegee between the defendant and its liability for unseaworthiness. Having failed in its effort to establish due diligence on the part of either its own representatives or anyone else for whom it must answer, the defendant is liable for the cargo loss resulting from the unseaworthiness of its vessel.

What has been said here concerning the unseaworthiness stemming from the repairs at the Alabama Yard applies equally well to elements of unseaworthiness arising out of the repairs performed at the Todd Shipyard at New Orleans, as well as to unseaworthiness with respect to the manning of the ship. At New Orleans, the repairs made to the discharge line of the main condenser and the inlet pipe of the auxiliary condenser were such as to leave these elements in a weakend condition, and with regard to the inlet pipe, susceptible to cracking and permitting the inrush of water to the engine space. Prior to sailing, two engineering officers left the ship and were not replaced by licensed officers. Apprentice engineers were promoted to fill their place. The inexperience of one of these apprentices can be inferred from his failure to shut down the propulsion turbine after the lube-oil pump malfunctioned.

The relevance of these latter elements of unseaworthiness to the sinking of the "PERAMA" may be somewhat less clear than that of the unseaworthiness resulting from the repair work at the Alabama Shipyard. Nonetheless, they may be regarded at least as contributing causes to the sinking of the "PERAMA." Water was in fact observed rushing into the engineroom, and there is at least substantial probability that efficient and experienced action taken by a competent crew during the salvage operations might have prevented the loss of the ship.

3. *Limitation of Liability.*

■ With respect to the question of limitation of liability, it should be pointed out that the defendant has not pressed this issue on retrial. Its briefs make no reference to this partial defense. It might well be deemed to have abandoned this defense. Nevertheless, in so far as the defense is clearly set forth in the pleaded answer,[10] and in the pretrial order, and the plaintiffs have replied to

---

9. This participation is described more fully in the discussion of the issue of limitation of liability which follows.

10. Although 46 U.S.C. § 185 provides a method for instituting limitation proceedings, such method is not the exclusive

it in their retrial briefs, the court is constrained to address the issue.

██ The partial defense of limitation of liability is provided for in 46 U.S.C. § 183. The test for limitation is whether or not the loss occurred "without the privity or knowledge" of the owner of the vessel. Section 183 provides in part:

"§ 183. Amount of liability; loss of life or bodily injury; privity imputed to owner; 'seagoing vessel.'

"(a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

██ A finding of liability predicated on a want of due diligence does not necessarily bar a finding that the limitation provided in § 183 should be applied. As indicated by the Court of Appeals, in reversing and remanding this case for retrial, it may sometimes be the situation that proof held insufficient to exonerate from liability predicated on want of due diligence, is nevertheless sufficient to

warrant limitation predicated on lack of privity or knowledge.[11]

The relevant question for purposes of § 183 limitation is whether the owner, in this case a corporation, was without "privity or knowledge." When the owner is a private person, the inquiry into "privity or knowledge" can be made more readily than when the owner is a corporation. In the former situation, there need be no uncertainty as to whose "privity or knowledge" is at issue. In the latter, however, that very uncertainty exists because of the lack of any single individual in whom the fictitious corporate "personality" resides.

In Coryell v. Phipps (The Seminole), 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943), the Supreme Court held that the liability of an individual owner would be limited under the facts there present. The Court observed that (p. 412, 63 S.Ct. p. 294):

"One who selects competent men to store and inspect a vessel and who is not on notice as to the existence of any defect in it cannot be denied the benefit of the limitation as respects a loss incurred by an explosion during the period of storage, unless 'privity' or 'knowledge' are to become empty words. If [§ 183] does not give protection to the individual owner in these circumstances, it is difficult to imagine when it would."

The Court distinguished the case before it from others where limitation had been denied to corporate owners and explained that (p. 411, 63 S.Ct. p. 293):

way of seeking to limit liability. If suit is brought against the owner, as here, the defense of limitation may be raised in the answer. The Scotland, 105 U.S. 24, 33–34, 26 L.Ed. 1001 (1882); Kutger v. United States, 169 F.Supp. 104 (D. Fla.1958); Deep Sea Tankers v. The Long Branch, 258 F.2d 757 (2d Cir. 1958), cert. denied, 358 U.S. 933, 79 S. Ct. 316, 3 L.Ed.2d 305 (1959), reh. denied, 359 U.S. 921, 79 S.Ct. 578, 3 L. Ed.2d 583 (1959); Odegard v. E. Quist, Inc., 199 F.Supp. 449 (E.D.N.Y.1961).

11. Federazione Italiana dei Consorgi Agrari v. Mandask Compania de Vapores, S.

A., 342 F.2d 215 (2d Cir. 1965). The Court said, at p. 217, "It is possible that the evidence which was held sufficient on the issue of limitation of liability to support a finding that the loss of the cargo was not due to the default or lack of care of the owner was considered insufficient to support such a finding on the issue of liability. See Gilmore and Black [The Law of Admiralty] at 696–97 and cases cited there. But such a conclusion would, under the circumstances of this case, require an express statement together with some discussion and explanation."

"A corporation necessarily acts through human beings. The privity of some of those persons must be the privity of the corporation else it could always limit its liability. Hence the search in those cases to see where in the managerial hierarchy the fault lay."

A similar search must be made in the case before this court. In making that search, it is well to bear in mind the Supreme Court's observation as to the thrust of the corporate shipowner cases (p. 410, 63 S.Ct. p. 293):

"In those cases it is held that liability may not be limited under the statute where the negligence is that of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred. Spencer Kellogg & Sons Inc. v. Hicks, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 and cases cited; 3 Benedict, Admiralty (6th ed.) § 490.

The Court also observed that "privity, like knowledge, turns on the facts of particular cases." [12]

 In the instant case, the testimony offered at trial reveals that the defendant's representatives, Stavraka and Kanapaux, exercised a large degree of responsibility in the carrying out of the repair work and were well apprised of both the general and detailed nature of the work being carried on. In addition, the defendant's president, Anastassios Sideratos, visited the Alabama Yard and was consulted about details of the work and was kept closely informed by his representatives regarding the nature and progress of the work, both in Alabama, and at New Orleans.

Under the circumstances of this case and the state of the evidence, this court cannot say that the loss was occasioned by circumstances with respect to which the owner of the "PERAMA" was without knowledge or privity. Having carefully considered all the evidence, it appears that the scope of the authority of all three men was sufficiently broad to categorize them as being high enough in the managerial hierarchy to impute their knowledge and privity to the corporation. Their actual knowledge, awareness and participation in the renewal and repair work, so imputed, is sufficient to bar defendant shipowner from disclaiming knowledge and privity, and calls for a denial of the request for limitation.

Let a decree in conformity with the foregoing findings and conclusions be settled before the undersigned, and on the return date of said notice of settlement the attorneys will be heard on whether provision should be made in said decree for the designation of a Commissioner to determine damages or whether a money judgment should be entered forthwith for damages, if found by the court to be liquidated.

So ordered.

12. 317 U.S. at 411, 63 S.Ct. at 294.