**MORAN TOWING & TRANSPORTA-TION CO., INC., Plaintiff-Appellee,**

v.

**The CITY OF NEW YORK, Defendant-Appellant.**

**No. 968, Docket 79–7838.**

United States Court of Appeals, Second Circuit.

Argued March 28, 1980.

Decided April 28, 1980.

---

**8.** At the time of trial, appellant held a level 57 position and testified that his salary was "[a]round $35,000 or $36,000 a year."

Robert B. Pohl, Robert J. Zapf and Burlingham, Underwood & Lord, New York City, for plaintiff-appellee.

Leonard A. Mentzer, Allen G. Schwartz, Corp. Counsel, New York City, for defendant-appellant.

Before FRIENDLY and MESKILL, Circuit Judges, and THOMSEN,* District Judge.

THOMSEN, District Judge:

The City of New York, defendant below, appeals from the decision of the District Court for the Southern District of New York, Irving Ben Cooper, *Judge*, finding it solely liable for damages to a crane, mounted on a crane barge lashed to the port side of a tug owned and being operated by employees of plaintiff (Moran), when the top of the crane struck a girder under the Broadway lift bridge over the Harlem River while being towed upstream at about 0300 on February 17, 1974.

A span of the bridge, which is owned by the City, must be raised and lowered from time to time by a bridge tender, employed by the City, to permit water-borne traffic to pass under and subway trains and other users to pass over it. When fully raised the bottom of that span is 135 ft. above the river.

The boom of the crane was so adjusted that it projected about 35 ft. over the bow of the barge and about 100 ft. above the deck.

■ On duty at the time of the collision were the mate and a deckhand, both employed by Moran; the deckhand, who was serving as lookout, was in the wheelhouse with the mate to facilitate communication between them.[1]

As the flotilla approached the bridge, the mate blew three blasts on the tug's whistle to advise the bridge tender that it wished to pass under the bridge and to learn whether the bridge was fully raised. It was customary for the bridge tender to respond with three blasts of its whistle when the center span was up to its full height and two blasts when it was not. The span was lowered at the time, to permit a subway train to cross the bridge, and the bridge tender answered the tug with two blasts. The mate stopped the tug and waited about five minutes; he testified that he started forward only after he had received a three-blast signal from the bridge tender. The bridge tender testified that he had not sounded the three blasts.

The district judge made no findings of fact and wrote no opinion. He merely wrote, at the bottom of a paper entitled "Findings of Fact Proposed by Moran," the following untitled memorandum and order:

---

* Of the District of Maryland, sitting by designation.

1. The City has argued that the lookout was improperly positioned because he was not on the bow of the barge. Both the lookout and the mate testified that the lookout's station in the wheelhouse provided the best view and allowed the lookout to communicate easily with the mate. In view of all the circumstances, we find that the lookout was properly stationed in the wheelhouse. *See, e. g., Compania Maritima S. L. v. Moran Towing & Transportation Co., Inc.,* 197 F.2d 607 (2 Cir. 1952); *Columbia Dredging Corp. v. New York P. & N. R. R.,* 46 F.2d 988 (4 Cir. 1931).

2/8/77—The case was well presented on both sides. The plaintiff prevails by a bare preponderance of the credible evidence.

SO ORDERED:

Irving Ben Cooper
USDJ

■ The district judge must have believed that the bridge tender blew three' blasts before the tug and tow proceeded under the bridge, and we see no reason to find otherwise. Since the center span of the bridge had not risen to its full height, as the bridge tender should have known, he was negligent in sounding the three blasts when he did, without further communication with the tug, and his negligence caused or contributed to the accident.

■ There remains the issue whether those in charge of the tug and tow were also negligent. Upon receiving the three-blast signal from the bridge tender and seeing the center span rise, the mate started the tug and proceeded toward the center span, which had in fact stopped rising at a level about 18 inches below the tip of the boom of the crane on the barge. Two lights were located at the bottom of the center span, as required by 33 C.F.R. § 118.85. A green light showing indicated that the span was at its full height; a red light showing indicated that it was not; but neither the lookout nor the mate looked to see which light was showing after the span started to rise. The mate was busy keeping the flotilla in the center of the channel, and was not negligent in failing to observe the span and its lights. The same cannot be said for the lookout. He testified that he was looking at the tip of the boom from the time the flotilla resumed its progress; he did not observe or look for the light on the span until the tip of the boom, struck the bottom of the span, although the light was in his line of vision while looking forward. He testified that . when the tug resumed its progress it appeared to him the bridge was fully open; he did not explain how he arrived at this erroneous conclusion. His failure to observe the bottom of the span and whatever light was shining, and to report his observation to the mate, was negligent; a lookout has a duty to look out and to report relevant and material observations to the person in charge of navigation. *Erie Lackawanna Ry. v. Timpany*, 495 F.2d 830 (2 Cir. 1974); *Circle Line Sightseeing Yachts, Inc. v. City of New York*, 283 F.2d 811 (2 Cir. 1960), *cert. denied*, 365 U.S. 879, 81 S.Ct. 1030, 6 L.Ed.2d 191 (1961); *Sun 'Oil Co. v. S. S. Georgel*, 245 F.Supp. 537, 545 (S.D.N.Y.1965) (Levet, J.) (citing many cases), *aff'd per curiam*, 369 F.2d 406 (2 Cir. 1966). "If [the lookout] fails to see lights or vessels which proper watchfulness would have disclosed, that fact 'unexplained, is conclusive evidence of a defective lookout' and his vessel is in fault." J. Griffin, *The American Law of Collision* § 112 (1949) (quoting *The New York*, 175 U.S. 187, 20 S.Ct. 67, 44 L.Ed. 126 (1899)).

The lookout did not adequately perform his duties in this case, and his negligence contributed to the collision between the crane and the bridge. The lookout's failure constitutes a statutory fault, a violation of 33 U.S.C. § 221.[2] The rule of *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873), places upon the tug the burden of showing that its statutory fault could not have caused the accident. That burden was not met in this case.

■ The old admiralty "rule of divided damages," under which damages were divided equally whenever two or more parties were found to be guilty of contributory fault, regardless of the relative degree of their fault, see *The Schooner Catharine v. Dickinson*, 58 U.S. (17 How.) 170, 15 L.Ed. 233 (1854), has been replaced by a rule requiring liability for such damages to be allocated among the parties proportionately

---

**2.** 33 U.S.C. § 221 provides:

—Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

to the comparative degree of their fault. *United States v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 411, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 251 (1975). Such allocation is not always easy. We find and conclude, after considering the evidence and the briefs and arguments of counsel, that in this case the damages should be so allocated that the City of New York be responsible for 75 percent and Moran Towing & Transportation Co., Inc., for 25 percent of the damages.

The case is remanded to the district court for further proceedings consistent with this opinion.