**A.F.A. TANKER CORP., as Owner of the M.V. "QUEENS BAY", her engines, boilers, tackle, etc., Plaintiff,**

v.

**REINAUER TRANSPORTATION COMPANY, Defendant.**

No. 81 Civ. 1165 (CHT).

United States District Court, S.D. New York.

Sept. 28, 1984.

As Amended Oct. 15, 1984.

Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City, for plaintiff; Robert J. Giuffra, James E. Ryan, New York City, of counsel.

McHugh, Leonard & O'Conor, New York City, for defendant; Stephen J. Buckley, New York City, of counsel.

## OPINION

TENNEY, District Judge.

It is said that time and tide wait for no man.[1] This is a case where a ship captain did not wait for the time or the tide and recklessly ran his ship, the M/V QUEENS BAY ("QUEENS BAY"), aground. The owner of that ship alleges that the negligent seamanship of defendant's ship, the CURTIS REINAUER ("CURTIS"), was the cause of the grounding. Specifically, the owner alleges that, in the course of violating provisions of the Navigation Rules for Harbors, Rivers, and Inland Waters Generally, 33 U.S.C. §§ 151 *et seq.* (1976) (current version at 33 U.S.C. §§ 2001 *et seq.* (1982)), the CURTIS crowded the QUEENS BAY. Since the Court finds that the pilotage and seamanship of defendant's ship were not causative factors in the grounding, plaintiff cannot prevail.

Based on the testimony and evidence presented at a bench trial held between June 1 and June 22, 1983, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

Plaintiff A.F.A. Tanker Corp. ("A.F.A."), a New York corporation, was on December 14, 1979 the owner of the QUEENS BAY, a coastal tanker of 418 gross tons, overall length 185.5 feet, breadth 28.4 feet, depth 11.8 feet, with a rated horsepower of 1000. On that date she was laden with approximately 7000 barrels (approximately 291,000 gallons) of No. 2 heating oil and her drafts were approximately 11 feet forward and 11 feet 6 inches aft. Joint Pre-Trial Order, 81 Civ. 1165 (CHT), filed May 31, 1983,

---

1. There is a tide in the affairs of man, Which, taken at the flood, leads on to fortune; Omitted, all the voyage of their life Is bound in shallows and in miseries. Shakespeare, *Julius Caesar*, IV. 111. 217.

¶ 3(a)(2). Her master was Captain Alfred Babich ("Captain Babich"), the crew consisting of a mate, Mike Belic ("Belic"), an engineer, and two deckhands.

At all times pertinent hereto the QUEENS BAY was in the company of the M/V PRINCESS BAY ("PRINCESS BAY"), a coastal tanker, overall length 200 feet, breadth 28 feet, a cargo capacity of 7600 barrels of gasoline or No. 2 fuel oil, and a draft of approximately 11 feet forward and 11 feet 6 inches aft. Her captain was Captain William Gillikin ("Captain Gillikin") and her crew consisted of a mate, an engineer and four deckhands. *See* Trial Transcript ("Tr.") at 24–29. The PRINCESS BAY was owned by Eastern Transportation which in turn was owned by John Alban, the owner of A.F.A. Thus the QUEENS BAY and PRINCESS BAY were under the same ownership.

The QUEENS BAY on that date was engaged on a voyage from the Exxon refinery at Constable Hook, Bayone, New Jersey, to Gulf Industries Petroleum Facility in Mount Vernon. The PRINCESS BAY was engaged on a voyage from the B.P. Terminal near Staten Island to Power Test in Mount Vernon. Thus, both ships were travelling via Eastchester Bay and the Hutchinson River.

*The Location of the Events at Issue: Geography and Hydrography*

Eastchester Bay is situated between City Island to the east and Throgs Neck to the west and has general depths of 7 to 10 feet until one reaches a dredged channel about ½ mile west of Belden Point, the northernmost part of City Island. This dredged channel leads northward through Eastchester Bay and thence into the Hutchinson River to the head of the river navigation at the City of Pelham, some 4.3 miles above the channel entrance off Belden Point. "The shores of the Bay are fringed with boulders, and there are many shoals; caution is essential, especially where the depths are not more than 3 feet greater than the drafts." Defendant's Exh. C (United States Coast Pilot 2, Fourteenth ed., Jan. 1979), at 201–202; Plaintiff's Exh. 1. The depths of the dredged channel from 1973 to October 1977 were 6 feet from channel entrance to the Hutchinson River Bridge, thence 4½ feet to the Boston Post Road Bridge, and thence 3⅓ feet to Pelham.[2] There are numerous rocks and shoals on both sides of the channel near the entrance to the Hutchinson River. Defendant's Exh. C.

Two bridges are encountered on entering the Hutchinson River from Eastchester Bay on an inbound or northerly course: the first is the Pelham Parkway bascule bridge ("Pelham Bridge"), some 1.9 miles from the channel entrance off Belden Point; and the second, the Amtrak lift bridge ("Amtrak Bridge"), one-tenth of a mile north of the Pelham Bridge. These two bridges, together with the New England Thruway Bridge, a bascule bridge just south of Pelham, are equipped with VHF–FM radiotelephone channels for Channels 13 and 16. *Id.*

Since the Eastchester Bay is a shallow area with mean low water reported in feet rather than fathoms, tide is an extremely important factor in pilotage. Commercial vessels such as the QUEENS BAY attempt to enter the Hutchinson River on a rising tide, unload and exit on a falling tide. Otherwise the ship might be caught upriver by the falling tide and immobilized until the next tide.[3] On December 14, 1979 high water at Willets Point was at 8:06 P.M. and 8:08 P.M. at Throgs Neck, and the height of the tide in Eastchester Bay was 6.1 feet. *See* Tr. at 145–146; Plaintiff's Exh. 1; Defendant's Exh. B (U.S. Dep't of Commerce Tide Tables 1979—East Coast of North and South America).

It is undisputed that both the QUEENS BAY and PRINCESS BAY had a draft 11 feet forward and 11 feet 6 inches aft. It is

---

**2.** As will appear hereinafter, some of the depths upriver (which do not appear on the charts) are not constant, and there are many shoals south of the Pelham Bridge.

**3.** On December 8, 1979 the QUEENS BAY and the PRINCESS BAY had been delayed at Mount Vernon from 5:45 P.M. until 1:00 A.M. due to the ebb tide. *See* Plaintiff's Exh. 4.

also clear that on a 6.1 foot tide traversing areas at high tide with soundings of 5 feet or less a draft of less than 11.1 feet forward and 11.5 feet aft would be required. Indeed, the United States Coast Pilot 2, Fourteenth Edition, as on issue on December 14, 1979, advises that "caution is essential, especially where the depths are not more than 3 feet greater than the drafts." Defendant's Exh. C, at 201. Tidal currents have a velocity of 1.5 knots at Pelham Bridge, *id.* at 202; high tide occurs at the bridge one hour ahead of high tide at Mount Vernon. Tr. at 75.

*Procedures Followed by Inbound and Outbound Vessels*

Despite the fact that the dredged channel appears on official government charts, *see, e.g.,* Plaintiff's Exh. 1, it was not used in 1979 or for many years prior thereto by commercial vessels of the size involved herein. The channel is only 150 feet wide which makes passage or overtaking by inbound and outbound vessels difficult and maneuvering a problem. More important, there had been bad shoaling which had made the channel impassable in certain places.

In lieu of the dredged channel, pilotage for many years had been effected by both inbound and outbound vessels through a "back-door" course. The inbound course in Eastchester Bay ran north from Buoy No. 46A to Buoy No. 2 (Cuban Ledge), to Buoy No. 4, and then to Buoy No. 5, a black can buoy situated off the southwest corner of a large garbage dump area which dump rose some 300 feet above the water level. Plaintiff's Exh. 1, marked "Dump". At Buoy No. 5, a course was laid on Buoy No. 11, some 700 yards away. Buoy No. 11 is a green-flashing buoy marking the west side of the dredged channel. Inbound ships would turn to port at Buoy No. 11 and pass black can Buoys No. 13 and 15 to port to reach the Pelham Bridge. Outbound vessels would turn to starboard at Buoy No. 11 and head for Buoy No. 5 or at night would steer for the flashing red lights on the tower of the Whitestone Bridge on Old Ferry Point which were on range with Buoy No. 5.

With the abandonment of the "dredged" channel as a means of ingress and egress, the topography and hydrography of Eastchester Bay and the Hutchinson River dictated certain procedures to be followed by inbound and outbound vessels. The factors which dictated these procedures were (1) the narrow breadth and depth of the river itself, (2) the two bridges which had to be raised to permit the passage of ships, and (3) the depth and bottom conditions of the approaches to the river.

Since the river was narrow there were only two places where ships could pass one another, both of which were north of the Amtrak Bridge at Goose Island and at Conner Street. *See* Plaintiff's Exh. 1. Further, it was impossible to pass south of the Amtrak and Pelham Bridges in the dredged channel. Indeed, the channel itself was not passable for outbound ships beyond light Buoy No. 11. As noted *supra,* the customary course for outbound ships was from Buoy No. 11 to Buoy No. 5 and from Buoy No. 5 to Buoy No. 4. Due to the shallow conditions existing it was not customary for outbound ships to overtake and pass another ship until after passing Buoy No. 4. That the same course was followed in reverse order by inbound ships is supported by the weight of the evidence, notwithstanding the fact that the captain of the PRINCESS BAY suggests an alternate inbound course between Buoys No. 4 and No. 11 to the west of the outbound course described above. *See* Plaintiff's Exh. 2.

Outbound and inbound traffic was also restricted by the necessity of bridge openings. The opening of the Amtrak Bridge was tied in with railroad operations; the Pelham Bridge was affected only by vehicular traffic. Accordingly, the Amtrak Bridge controlled the openings of both bridges which were only one-tenth of a mile apart and they normally operated in tandem.

Before commencing the outbound voyage, a ship upriver in the Hutchinson River must make a "security" call to the Amtrak

Bridge on Channel 13 (which is monitored by both bridges and by inbound and outbound ships) identifying the ship (and tow, if any) and whether light or loaded. The Amtrak Bridge will respond and advise the outbound vessel the time when the bridge will open for passage. This notice permits the vessel to adjust her speed accordingly. If more then one vessel is outbound at or about the same time, they will transit the bridges as a unit. Because of the conditions in the river and approaches already described, outbound vessels are given priority over inbound vessels. Tr. at 382–387. This priority extends beyond the bridges and through the approaches to the bridges to a point at least beyond Buoy No. 5 and between that buoy and Buoy No. 4. There is substantial evidence in the record that the appropriate area to pass is between Buoys No. 4 and No. 2.

The procedures to be followed by inbound ships have been clearly established. The initial holding area is between Buoy No. 2 and Buoy No. 4 which are approximately 1.15 and .75 nautical miles respectively from Buoy No. 11. In this area ships will, depending on their draft, wait for indication from watermarks in the area that the tide is sufficient to permit proceeding ahead or, once the tide is sufficient, will call the Pelham Bridge on Channel 13 to secure permission to proceed upstream. The bridge will respond and advise whether there are any outbound vessels, in which event the inbound vessels must hold or, absent such outbound vessels, the bridge will advise the inbound vessels of the time the bridge will be open for inbound traffic and for how long. *See generally* 33 C.F.R. §§ 117.1b(d), 117.155 (1983).

An overview of the area of the Bay where the alleged "crowding" occurred is found in Defendant's Exhibit A which shows Buoys No. 2, No. 4 and No. 5 lead-

ing into the northern-most section of the Bay, together with Buoys No. 9 and No. 11 which are situated along the west or southwest border of the dredged channel. Just to the west of Buoy No. 5 and extending to the north is a huge area constituting the city dump hereinbefore referred to. *See* Plaintiff's Exh. 1. The increasing weight of this dump has pressed the soil beneath out under the bulkheading and caused filling and a raising of the bottom in the area to the east of the line of the bulkhead. Thus the area 25 feet or more to the west of a line drawn from Buoy No. 5 to Buoy No. 11 is, despite the charted depths, not navigable by vessels such as those involved herein. Buoy No. 9, to the northeast of Buoy No. 5 and between the dump and Turtle Cove, marks rocks and shoals which extend at least 275 feet to the west toward the dump. Buoy No. 9 is some 775 feet from a line of course between Buoy No. 5 and Buoy No. 11. Along that line the soundings are for 5 feet mean low water.

### The Events on the Evening in Question

Captain Gillikin described his usual procedure, and the one followed by his ship, the PRINCESS BAY, on December 14, 1979, in covering the distance from the Throgs Neck Bridge-Whitestone area to the Pelham Bridge, and identified the times involved.[4] He testified that he commenced the trip to Mount Vernon at 1:00 P.M. and that he had passed the Throgs Neck Bridge and arrived at Buoy No. 46A at 3:45 P.M. after checking a watermark on the Bridge indicating half-tide. Tr. at 29–31. Since the QUEENS BAY did not leave her mooring stake at the Whitestone Bridge until 4:20 P.M., Plaintiff's Exh. 4, she must have been over 30 minutes behind the PRINCESS BAY at this time. Proceeding north of Buoy No. 46A on a course of 340° magnetic, the PRINCESS BAY reached Buoy

---

**4.** Captain Gillikin in the course of the trial plotted the "normal" inbound and outbound tracks which the PRINCESS BAY followed from Buoy No. 46A at the head of Eastchester Bay up to Buoy No. 11, and Captain Babich testified that these were the tracks which the QUEENS BAY normally followed. *See* Plaintiff's Exh. 2; Tr. at 34, 97–98. Significantly the outbound course

which he plotted was that which Captains Willmot and Horn testified was that followed by the GOWANUS and CURTIS. Moreover, the evidence indicates quite clearly that the PRINCESS BAY and QUEENS BAY were attempting to follow the inbound course on the evening of December 14, 1979. Indeed it was the only course on which to attempt a one-whistle passing.

No. 2 at Cuban Ledge at 4:00 P.M. According to Captain Gillikin, when he was in the neighborhood of Buoy No. 2 he was in the company of the QUEENS BAY, the tanker JOHN TABERLING ("TABERLING"), and the tug RED WING. Tr. at 38. The PRINCESS BAY did not pause at Buoy No. 2 but proceeded on a course of 352° magnetic to a point midway between Buoy No. 2 and Buoy No. 4 where Captain Gillikin stopped to observe a watermark on the beach to the west. *See* Plaintiff's Exh. 2, marked "Watermark". This watermark consists of a rock or other structure off the beach which is on dry land at low tide. Captain Gillikin stated that when the tide rises so that the rock becomes an island, he knows the time has come to ask the Pelham Bridge or Amtrak Bridge for an opening. If there is outbound traffic the bridge will advise the inbound ships. In the instant case, he was advised on Channel 13 at 5:30 P.M. that there were two outbound tugs and to hold back. *See* Plaintiff's Exh. 3; Tr. at 31–35, 70.

Captain Gillikin stated further that, assuming he is allowed to proceed, he continues on course 352° magnetic until he reaches Buoy No. 4 and proceeds until a street on the west shore lines up with him—*see* Plaintiff's Exh. 2, marked "Street"—at which point he changes course to 22° magnetic heading northeast toward a "V"-shaped opening in some trees just north of the dredged channel and on the shore of Pelham Bay Park, this course directing him to Buoy No. 11 and into the dredged channel leading to the Pelham Bridge. *See* Plaintiff's Exh. 2, marked "Trees"; Tr. at 35–36. There is an additional mark, a rock in Turtle Bay to the northeast of Buoy No. 9 which rock is submerged when the tide is sufficient for an 11.6 foot draft. *See* Plaintiff's Exh. 2, marked by a red circle; Tr. at 37.

Although Captain Gillikin admitted that on December 14 he was instructed by the Bridge at 5:30 P.M. to hold between Buoys No. 2 and 4, he nevertheless proceeded beyond Buoy No. 4 into an area between Buoy No. 4 and Buoy No. 9, Tr. at 39–40, 70, and it was in this area south of Buoy No. 5 that the PRINCESS BAY and the QUEENS BAY, showing their port lights, were first observed by Captain Dirk Horn ("Captain Horn") of the defendant's outbound tug, the CURTIS, when that tug came around Buoy No. 11.

Over an hour earlier, at approximately 4:15 P.M., the CURTIS, under command of Captain Horn, had passed the Pelham Bridge en route to Mount Vernon to pick up a light manned barge RTC 340 owned by defendant. She was followed some 15 minutes later by the tug CAPTAIN GOWANUS ("GOWANUS") under command of Captain Warren Willmot ("Captain Willmot") and bound for the rock-cut south of Mount Vernon and north of the New England Thruway Bridge to pick up a barge loaded with scrap iron. *See* Plaintiff's Exh. 1. The CURTIS was 90 feet long, had a draft of 7 feet at the bow, 9½ feet at the stern, and a width of about 24 feet. The barge RTC 340 when empty had a draft of 1 foot 6 inches, was 240 feet in length and 44 feet in width. When loaded it had a draft of 10 feet 6 inches. The draft of the GOWANUS was 9 feet, that of the loaded barge was 10 feet.

Departing at 5:10 P.M. with the empty barge in tow with gate lines,[5] the CURTIS proceeded downriver and at Conner Street, *see* Plaintiff's Exh. 1, made a radio security call on Channel 13 notifying all vessels in the vicinity that she was coming downriver. This message was picked up by the GOWANUS downriver and the GOWANUS notified the CURTIS to follow, and called the two bridges to advise that there were two tugs with tows coming out.[6] The GOWAN-

---

**5.** Gate lines are employed in towing a barge to keep the barge a few feet astern of the tug and to control the course of the barge. *See* Defendant's Exh. 1.

**6.** It is customary to tow an empty or "light" barge since it is often impossible for the pilot of

the tug to see over the barge if it is being pushed. When loaded, the practice is to push since the barge is then lower in the water. Thus, in this case the GOWANUS was pushing a loaded barge, and the CURTIS was towing a light barge astern. When towing astern on a

US, followed by the CURTIS, passed under the Pelham Bridge between 5:41 and 5:49 P.M. Defendant's Exh. H.[7]

Unlike the GOWANUS, which was a "day" boat—i.e., where the captain was on watch whenever underway—the CURTIS was a regular watch boat where the captain and mate alternated watches. Such alternate watches were observed on the QUEENS BAY and the PRINCESS BAY. Accordingly, Captain Horn relieved the mate at 6:00 P.M. when the CURTIS was at Buoy No. 15 and some 200–250 feet behind the GOWANUS. At the time he took over, he was informed by his mate that two vessels, the QUEENS BAY and the PRINCESS BAY, were inbound and had so advised the Pelham Bridge. The mate also advised Captain Horn that the Pelham Bridge had told the PRINCESS BAY and the QUEENS BAY that they had seven minutes until the bridge would close. Tr. at 479; Defendant's Exh. J. Captain Willmot of the GOWANUS, also aware of the inbound traffic, communicated over Channel 13 with the PRINCESS BAY after passing the Pelham Bridge and agreed on a one-whistle (port-to-port) passing. Tr. at 39–49; 507–508. When Captain Horn was rounding Buoy No. 11, he observed the two tankers to the southwest showing their port lights one behind the other in the area between Buoy No. 4 and can Buoy No. 9 and south of can Buoy No. 5. See Plaintiff's Exh. 11; Exh. 8 (Deposition of Defendant, Reinauer Transportation Co., by Captain Dirk Horn, Feb. 23, 1982), at 22–25. The CURTIS made its turn to starboard passing Buoy No. 11 and leaving the buoy about 30–40 feet to starboard and headed for Buoy No. 5, some 2100 feet to the southwest steering on the Whitestone range, speed 1½ knots. According to Captain Gillikin of the PRINCESS BAY, he passed the GOWANUS just past Buoy No.

5. Tr. at 40. According to Captain Horn of the CURTIS, the PRINCESS BAY passed the CURTIS by 50 feet and off Buoy No. 9, and the QUEENS BAY passed the CURTIS when the CURTIS was about 35 feet off Buoy No. 5 and 300–400 feet to port of the QUEENS BAY. See Plaintiff's Exh. 11; Exh. 8 at 25–28, 31; Tr. at 415, 452, 457–458. Captain Horn estimated that the QUEENS BAY was 500–1000 feet astern of the PRINCESS BAY when he first observed them. Tr. at 454. At the time the CURTIS passed the QUEENS BAY off Buoy No. 5 the GOWANUS was well south of Buoy No. 5 heading for Cuban Ledge and Buoy No. 2. Captain Babich of the QUEENS BAY testified that he never saw the GOWANUS. Tr. at 131–132.

Captain Gillikin and Captain Babich testified that on rounding Buoy No. 11 the CURTIS bore directly into the path of the inbound vessels, the two missing the PRINCESS BAY by only 2 or 3 feet and the QUEENS BAY by 10 to 15 feet. Tr. at 42, 43, 50, 60, 63, 106, 107. Yet, Captain Willmot of the GOWANUS, who was only 200–250 feet ahead of the CURTIS, never observed them.

## DISCUSSION

■ It is axiomatic that a plaintiff or libelant initially has the burden of proof to establish by a preponderance of evidence the facts upon which the right to recover rests. See *Grace Line, Inc. v. United States Lines Co.*, 193 F.Supp. 664, 670 (S.D.N.Y.1961) (Friendly, Circuit Judge) (citing cases) (burden on libelant), *aff'd on opinion below*, 302 F.2d 933 (2d Cir.1962).

### I.

In the instant case, plaintiff's principal claim is that defendant's ship, the CURTIS, during an agreed port-to-port passing, vio-

gate line, the pilot of the tug must avoid grounding at all costs as the barge can capsize the tug in a sudden stop or other maneuver.

7. The fact that there was an 8 minute interval involved in the passage by the outbound ships does not mean that they were 8 minutes apart as suggested by Captain Gillikin. Tr. at 92. The

slow speed of the CURTIS was dictated, at least in part, by the slow speed of the heavily laden GOWANUS. Since the CURTIS was anxious to pass the GOWANUS, and subsequently did around Buoy No. 4, there was no reason for her to lag behind.

lated the so-called "narrow channel rule," 33 U.S.C. § 210 (1976) (repealed) (current version at 33 U.S.C. § 2009 (1982)) ("Article 25"),[8] and the similar mandate of the rule contained at 33 U.S.C. § 203 (1976) (repealed) (current version at 33 U.S.C. § 2014 (1982)) ("Article 18").[9] Plaintiff asserts that in so doing defendant's ship crowded plaintiff's ship, the QUEENS BAY, forcing her to turn to starboard and to strike an obstruction on the bottom "of the area around Eastchester Creek." Complaint, 81 Civ. 1165 (CHT), filed Feb. 27, 1981, ¶ Fourth. The defendant has denied such allegations, *see* Answer, 81 Civ. 1165 (CHT), filed Mar. 20, 1981, ¶ Fourth, and on the trial has introduced evidence through Captain Horn of the CURTIS and Captain Willmot of the tug GOWANUS, which was leading defendant's ship by some 200-250 feet, that the two tugs were pursuing a course along the west side of the channel. According to Captain Horn he passed well clear of the PRINCESS BAY and the QUEENS BAY and knew nothing at that time of any crowding or grounding.

*A.* Since neither the PRINCESS BAY nor the CURTIS observed or heard any radio traffic regarding the grounding and since no possible witnesses from the TABERLING or the tug RED WING were called, we have at issue the credibility of Captain Babich of the QUEENS BAY. In weighing that credibility it is necessary to consider not only the consistencies and inconsistencies of his testimony but also what he did, and did not do at the time of the alleged grounding.

It seems clear, as discussed below, that a one-whistle (port-to-port) passing was intended by the ships involved herein. An agreement to such a passing was reached via radio by the PRINCESS BAY and the GOWANUS, and was presumably monitored by the QUEENS BAY on Channel 13 since all ships requiring bridge openings were required to monitor that channel. In such a case the use of a whistle signal can be dispensed with. See discussion *infra*. However, when the CURTIS allegedly bore directly head-on to them, neither the PRINCESS BAY nor the QUEENS BAY ever made a one-whistle passing signal or a danger whistle signal. Neither the PRINCESS BAY nor the QUEENS BAY communicated with the CURTIS before or after the alleged grounding, and it would appear that the PRINCESS BAY was not aware at that time that the QUEENS BAY had grounded. Captain Babich of the QUEENS BAY testified that he had communicated with the TABERLING and the tug RED WING after he was aground, but this is not corroborated by either of these vessels, or by the CURTIS or the GOWANUS, and Captain Horn testified he had heard no such traffic. Tr. at 470. No contemporaneous entry was made in the log of the QUEENS BAY explaining the delay in reaching Mount Vernon other than a notation regarding the delay at the Amtrak Bridge and traffic. Although Captain Gillikin claimed he had made an entry in the log of the PRINCESS BAY, such log was never produced.

Although the PRINCESS BAY is not a party to this action and has made no claim against the CURTIS, it is necessary to consider the movements of the PRINCESS BAY prior to the alleged crowding incident. This is necessary because Captain Babich did not take the conn of the QUEENS BAY until some time between 5:45 and 6:00

---

**8.** This provision read in full:

> § 210. Steam vessel in narrow channel (article 25)
>
> In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel.
>
> In narrow channels a steam vessel of less than sixty-five feet in length shall not hamper the safe passage of a vessel which can navigate only inside that channel.

33 U.S.C. § 210 (1976).

**9.** This provision read in pertinent part:

> § 203. Steam vessels approaching, meeting, or passing one another; banks obstructing view; leaving dock (article 18)
>
> Rule I. When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on to the port side of the other....

33 U.S.C. § 203 (1976).

P.M.[10] and because Belic, the mate, whom he relieved was not called as a witness by plaintiff.

It seems clear that the PRINCESS BAY, drifting south of Buoy No. 9, was in communication with the Pelham Bridge around 5:30 P.M. at which time she was instructed to "hold" to await the passage of two outbound tows through the Amtrak and Pelham Bridges. *See* Tr. at 70, 72. It also seems clear that the Pelham Bridge informed the PRINCESS BAY at that time or shortly thereafter that the Bridge would be kept open for the PRINCESS BAY from 5:47 until 6:00 P.M. *See* Tr. at 73; Plaintiff's Exh. 3. This message may well have been sent while the GOWANUS and the CURTIS were effecting their passage through the Bridges between 5:41 and 5:49 P.M. *See* Defendant's Exh. H. According to Captain Horn, the mate advised Captain Horn, at the time he assumed the conn, that the PRINCESS BAY and the QUEENS BAY had been told by the Pelham Bridge they had seven minutes to reach the Bridge. Tr. at 479.

Captain Willmot of the GOWANUS, on clearing the Pelham Bridge, called the PRINCESS BAY on Channel 13 and agreed on a one-whistle passing. Tr. at 408. Although Captain Gillikin of the PRINCESS BAY testified that his agreement was with the CURTIS, Tr. at 40, Captain Horn of the CURTIS denied that he had any communication with the PRINCESS BAY or the QUEENS BAY during the entire episode.

The character of the passage by the CURTIS and the PRINCESS BAY is in dispute. According to Captain Gillikin, the PRINCESS BAY passed the GOWANUS tug well clear of her and just beyond Buoy No. 5, Tr. at 40, and that he thereafter passed the CURTIS just north of Buoy No. 9. Tr. at 43. Further, Captain Gillikin stated that he observed the CURTIS outbound around Buoy No. 13 headed for Buoy No. 11. At this time the PRINCESS BAY was an undetermined distance south of Buoy No. 9. As the CURTIS rounded

Buoy No. 11, Captain Gillikin observed the range lights and both the red and green running lights of the CURTIS and was concerned because the PRINCESS BAY was then almost abeam of Buoy No. 9 moving ahead slowly with the shoals and rocks, which extended some 250 feet or more west of that buoy, close to starboard. According to Captain Gillikin he called the CURTIS to give "a showing," expecting the CURTIS to head farther to the southwest, but received no reply and the CURTIS passed him clear. Captain Horn denied that he received such a call. Captain Gillikin testified that the CURTIS tow, however, with its greater beam, missed the PRINCESS BAY by only 2 or 3 feet, so close that the deckhand of the PRINCESS BAY had a hand fender over the side to avoid contact. Tr. at 42–43. Captain Gillikin admitted that the passing occurred north of Buoy No. 9. Tr. at 43. At the time of the passing or immediately thereafter Captain Gillikin looked aft and saw only the port running light of the QUEENS BAY about 300 feet astern. Tr. at 43–44. At the time he passed the CURTIS his "vessel had practically no speed at all" because he was "just maneuvering to stay in position." Tr. at 81. According to Captain Gillikin, shortly after passing the CURTIS the PRINCESS BAY rubbed her starboard rolling chock on a rock but suffered little damage and did not ground. Tr. at 45–46. She proceeded on to her destination passing through the Pelham Bridge between 6:00 and 6:04 P.M. Defendant's Exh. H.

According to Captain Babich, the QUEENS BAY was just above and 200 feet to the east of Buoy No. 5 when he assumed the conn some time between 5:45 and 6:00 P.M. Tr. at 100, 135; Plaintiff's Exh. 5. The PRINCESS BAY was up ahead of him, and they were the only vessels there at that time. Tr. at 102. He further testified that the GOWANUS tug must have passed him off Buoy No. 5 before he came on watch as he never saw that vessel, and that

---

**10.** In all probability, however, Captain Babich was alerted by the mate when the Pelham Bridge advised that the Bridge would remain open from 5:47 to 6:00 P.M.

he was only waiting for the CURTIS to appear. Tr. at 104, 131. According to Captain Babich he waited until he saw the CURTIS traversing Buoys No. 13 and 11 and then started to follow the PRINCESS BAY. While he was between Buoys No. 5 and 9 he observed the CURTIS bearing down on him as he was following the PRINCESS BAY along their inbound course previously described. Tr. at 106–107; Plaintiff's Exh. 5. He stated that he then saw the CURTIS bearing down on the QUEENS BAY after passing the PRINCESS BAY and that the CURTIS' course caused him to change his own course from 22° to 40° and to veer to starboard and to avoid the CURTIS by 10–15 feet. He further testified that in trying to return to his intended track he ran aground at the location just off Buoy No. 9, indicated on Plaintiff's Exhibit 5 by the arrow in the vicinity of Buoy No. 9, representing his heading at that time. Tr. at 108. Captain Babich admitted that he never sounded any alarm whistles or communicated with the CURTIS before or after the alleged crowding. Tr. at 113, 119–121. The QUEENS BAY did not have an adequate lookout posted and was travelling at 5–7 knots when she grounded. Tr. at 119, 150.

Other than the questionable testimony of Captain Babich, there is nothing upon which the Court can fix the location of the alleged grounding with any degree of certitude. Captain Babich testified that he was already aground when the CURTIS passed him, yet he never communicated with that ship which he claims precipitated the grounding. Tr. at 110. According to Captain Babich he communicated with the tanker TABERLING and the tug RED WING when they passed to port after the grounding, but no witnesses from either vessel were called to confirm this assertion. Captain Horn of the CURTIS never heard such traffic. Tr. at 470. Neither Captain Gillikin of the PRINCESS BAY nor Captain Horn observed the grounding, and Captain Babich did not advise Captain Gillikin of the grounding until later that evening when he was docked in Pelham. Captain Horn never heard of the alleged grounding until a month later. Tr. at 408. Nor was any entry made in the log of the QUEENS BAY until after Captain Babich had conferred with her owner the following day after which a penciled entry with erasures was made at the bottom of the page for December 14. See Plaintiff's Exh. 4. The only contemporary entry in the log states that at 7:35 P.M. the QUEENS BAY arrived at Mount Vernon and notes "Delay Amtrak & Traffic." Id. The entry penciled in after-the-fact locates the grounding at approximately 6:15 P.M. between Buoys No. 5 and 11, close to Buoy No. 9—which is the same location as that given in Plaintiff's Exhibit 5. However, at the time of his pretrial deposition, Captain Babich after careful study located the site at an entirely different location, some 450 feet west of Buoy No. 9. See Defendant's Exh. A, marked by an arrow; Tr. at 123–125.

These facts, together with the delay in reporting the incident to the Coast Guard and the defendant, and the failure to conduct an internal survey of the QUEENS BAY until mid-January 1980 and the failure to conduct an external survey until August 1980, for which failure no satisfactory explanation has been furnished, together with the continued operation of the ship until the August dry-docking do not support a tortious grounding on December 14, 1979 and a claim of $600,000 of damages.

 In a collision between two ships or between a ship and an above-water water structure, i.e., a dock or pier, the damage will itself be evidence of the collision and will be contemporaneous. In a crowding case where the crowded vessel strikes an underwater obstacle and incurs damages, the precise time when the obstacle was encountered and its location is usually established by the testimony of witnesses and the possibility exists that the damage was caused at another time and place. In other words, where the damage incurred could have occurred under circumstances different from those alleged, the burden of proving time and location by a preponderance of the credible evidence is on the

damaged vessel. In the instant case the excessive draft and speed of the QUEENS BAY could have caused the damages claimed without the presence of the CURTIS. Indeed the portside damages are not compatible with the alleged maneuvering of the QUEENS BAY to avoid the CURTIS. This, coupled with the contradictory nature of the testimony of Captain Babich and the inconsistencies in the circumstances relating to the alleged crowding referred to above, dictate a finding of failure of proof and require dismissal.

■ *B.* Furthermore, even if the Court were to select one or the other site of the alleged grounding and to accept the testimony of Captains Babich and Gillikin to the extent that it is consistent, plaintiff could not recover even proportionate damages, for the sole fault with respect to the alleged grounding would rest with the QUEENS BAY and the PRINCESS BAY in passing the CURTIS between Buoys No. 5 and No. 11 and in the neighborhood of Buoy No. 9 in violation of local custom.

"A local custom such as an agreement to hold back may carry the force of law, and a vessel that breaches that agreement must shoulder the consequences." *In re Mac Towing Inc. v. American Commercial Lines,* 670 F.2d 543, 546 (5th Cir.1982) (citing *Union Oil Co. v. Tug MARY MALLOY,* 414 F.2d 669 (5th Cir.1960); C. Black & G. Gilmore, The Law of Admiralty § 7–13, at 515 (2d ed. 1975)); *Stevens v. F/V BONNIE DOON,* 655 F.2d 206, 208 (9th Cir.1981), *aff'd following remand,* 731 F.2d 1433 (9th Cir.1984). Local customs have been recognized and given force in this circuit. *See The Transfer No. 21,* 248 F. 459, 461–62 (2d Cir.1917); *The Luzerne,* 204 F. 981, 982 (2d Cir.1913). As stated in *Hogge v. SS YORKMAR,* 434 F.Supp. 715 (D.Md.1977):

## THE LAW OF COLLISIONS (AND ALLISIONS)

### A. *Generally*

The basis for liability in collision cases is fault; the mere fact of impact has no legal consequences. *The Java,* 81 U.S. (14 Wall.) 189, 20 L.Ed. 834 (1872). The fault, of course, must not be merely fault in the abstract; rather it must be fault which is a contributing cause to the collision. *P. Dougherty Co. v. United States,* 207 F.2d 626 (3rd Cir.1953), *cert. denied,* 347 U.S. 912, 74 S.Ct. 476, 98 L.Ed. 1068 (1954). The existence of fault can be measured only against accepted standards of conduct. In American admiralty law, these standards are generally derived from the following sources:

1. The Statutory Rules of Navigation (in this case the rules for the inland waterway).

2. Other statutes and regulations having the force of law.

3. Proved local customs.

4. The requirements of seamanship and due care. Gilmore & Black, *The Law of Admiralty* (2nd Ed.1975) § 7–3. . . .

*Id.* at 727.

It is established by the evidence that it was customary in 1979 and for many years prior—and indeed today—for inbound ships intending to ascend the Hutchinson River to hold between Buoys No. 2 and 4, or possibly slightly north of Buoy No. 4, until they received word from the Pelham Bridge as to whether there was outbound traffic and when the bridge would be open for inbound traffic. Tr. at 34–35, 74–75, 79 (Captain Gillikin); Plaintiff's Exh. 2, marked "Street"; Tr. at 406, 418 (Captain Horn); Tr. at 503, 513–514 (Captain Willmot); Tr. at 531–532, 553–555 (Captain Joseph Whalen ("Captain Whalen")—defendant's expert witness).

Requiring vessels to "hold" in the vicinity of Buoys No. 2 and 4 is not unreasonable. Buoy No. 4 is less than one mile from the Pelham Bridge, and since inbound traffic through the bridges is usually on a rising tide the tide will naturally tend to move such traffic northward and necessitate maneuvering. Although there is testimony that inbound vessels hold in the area between Buoys No. 2 and 4 to pass outbound vessels, the Court believes that once

word ·is received that outbound traffic has cleared the bridges, it is not unusual for ships to move to an area between Buoys No. 4 and 9—but not past Buoy No. 5. The Court further finds that as a matter of local custom inbound traffic does not move beyond Buoy No. 5 until outbound traffic has passed this buoy. One has only to examine Plaintiff's Exhibit 2 in the light of the prior description herein of the topography and hydrography of the area to understand the priority given to outbound vessels. Plaintiff's Exhibit 2 shows, according to Captain Gillikin, the plotted courses for inbound and outbound vessels. It is important to bear in mind that the rocks and shoals around can Buoy No. 9 extend at least 250 feet to the west so that the inbound track passes that buoy by 300 feet. Tr. at 37 (Captain Gillikin). Also it is clear that there is shallow water to the west of the outbound track which inhibits any move to starboard (or to the west) by outbound ships on that track. Tr. at 528–530 (Captain Whalen); Tr. at 508–510 (Captain Willmot).[11] Plaintiff's Exhibit 2 shows a distance of only 225 feet between the converging tracks off Buoy No. 9 which distance diminishes to zero as the tracks meet at Buoy No. 11.

Captain Gillikin of the PRINCESS BAY testified that he "was a little north of No. 9 Can, just past it" when he passed the CURTIS and tow. Tr. at 43. However, he admitted that "the only place we pass a vessel is between the No. 9 can, the No. 4 Nun or between the No. 4 Nun and the No. 2 buoy. These places we can pass. *We do not move past the No. 9 can buoy to pass a vessel.*" Tr. at 51 (emphasis added). Captain Babich of the QUEENS BAY did not deny that the best place to pass outbound traffic would be no farther north than Buoy No. 5, or down by Buoy No. 4. Tr. at 139. However, if he was proceeding close astern of the PRINCESS BAY he must have been attempting a passing abeam or north of Buoy No. 9.

Plaintiff · nevertheless argues that the CURTIS was in violation of Articles 18 and 25.[12] Plaintiff's arguments must fail.

First, whether the "narrow channel rule" of Article 25 is applicable is a mixed question of fact and law. The area involved was a fairway and the width of the fairway undoubtedly qualified it as a narrow channel. However, the application of the "narrow channel rule" is based not only on the physical aspects, i.e., the channel's width and hydrography, but also on the navigating use to which the channel or water is put. *See Skibs A/S Siljestad v. S/S MATHEW LUCKENBACH*, 215 F.Supp. 667, 681 (S.D.N.Y.), *aff'd on opinion below*, 324 F.2d 563 (2d Cir.1963). The purpose of the rule is to prevent the development of a situation which may lead to collision. Thus, applied in the instant case, the rule would dictate holding back by inbound ships to permit outbound vessels to proceed at least beyond Buoy No. 9. Therefore, it can properly be stated that the "narrow channel rule" in the instant case dictated the custom of granting priority to outbound traffic—a custom that plaintiff's ship failed to observe.

Second, apart from the fact that the CURTIS tow did keep as far to the starboard or west side of the channel as it could by leaving Buoy No. 5 only 30–35 feet to starboard, Tr. at 400, 415, 449–50, defendant contends that Articles 25 and 18 have no application to the subject case because the QUEENS BAY should not have been passing the CURTIS tow where she did. In *Deep Sea Tankers, Ltd. v. THE LONG BRANCH*, 258 F.2d 757 (2d Cir. 1958), two downbound tows in the East River argued with an upbound tanker, that was allegedly forced aground by the tows, as to whether the East River was a "narrow channel" within the meaning of Article

---

11. Plaintiff relies on the charted depths to refute the existence of this shoal water area. However, it has called no witnesses to refute the testimony of defendant's witnesses and Captain Gillikin in plotting the outbound course, clearly kept to the east of this area. *See* Plaintiff's Exh.

2. Captain Horn had described this shoal area in his pre-trial deposition. *See* Plaintiff's Exh. 8, at 38–40.

12. *See supra* notes 8 and 9.

25. The Court of Appeals, however, stated,

> [W]e need not give that point the consideration here that it perhaps deserves, as we hold the tows at fault for being where they had no business to be at a time when a deep draft vessel was steaming up the Range. Even if not a statutory fault this is plain, ordinary negligence.

*Id.* at 766. This reasoning is entirely applicable to the instant case. With the incoming tide and their lack of maneuverability in shallow water, the QUEENS BAY and the PRINCESS BAY should not have proceeded past Buoy No. 5 until the CURTIS had passed that buoy. The port-to-port passing agreement was not an invitation to proceed farther. Finally, the captains of the inbound ships were aware that tows proceeding around Buoy No. 11 had a tendency to crab or transfer eastward, and that this could be, and was in this case, accentuated by the wind. Tr. at 57–60.

Finally, it seems clear that both inbound ships misjudged the slow speed (1½ knots) of the CURTIS so that their speed of 7 knots, which was excessive under any circumstances, brought them into a peril for which they must bear sole responsibility. Tr. at 567. Whether the CURTIS was on the starboard side or in the middle of the channel has little relevance nor could she be expected to anticipate the speed of the trespassing inbound ships.

The most likely explanation of the events on the evening of December 14, 1979, is that the QUEENS BAY, speeding to catch up with the PRINCESS BAY and to reach the Pelham Bridge while it was still open, was suddenly confronted with a sharp reduction in speed by the PRINCESS BAY and turned sharply to starboard to avoid overtaking and colliding with that ship. As Captain Babich testified, he was running in excess of 5 knots when he went aground. Thus there was no reason for a danger signal nor was there any need to advise other ships in the vicinity of what was, in fact, reckless seamanship. It is likely that the QUEENS BAY and the PRINCESS BAY, both of which had been delayed in Mount Vernon on December 8, 1979 by the falling tide, were determined to avoid a repeat performance.[13]

## II.

There clearly was no violation of that aspect of Article 18 requiring a one-whistle port-to-port passing.[14] All of the ships involved agreed that a port-to-port passing was involved, such a passing had been agreed on by the leaders of each fleet, i.e., the GOWANUS and the PRINCESS BAY, and sounding of a one-whistle signal would have been superfluous unless a vessel involved did not believe a port-to-port passing was being effected. In such a case a danger signal should have been made. None was made.

Plaintiff also charges the CURTIS with failure to have an adequate lookout posted in contravention of 33 U.S.C. § 221 (1976) (repealed) (current version at 33 U.S.C. § 2002 (1982)).[15] Captain Horn testified

13. *See supra* note 3.

14. Article 18 read in pertinent part:
 § 203. Steam vessels approaching, meeting, or passing one another; banks obstructing view; leaving dock (Art. 18)
 Rule I. ... [E]ither vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other.
 . . . .
 Rule III. If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle.
 33 U.S.C. § 203 (1976).

15. This provision read in full:
 § 221. Usual additional precautions required generally (article 29)
 Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

that the lookout was stationed in the wheel-house. This was sufficient. *See Moran Towing & Transp. Co. v. City of New York,* 620 F.2d 356, 357 n. 1 (2d Cir.1980) (citing cases). Plaintiff also asserts, in a related argument, that the CURTIS was negligent in not using radar in the restricted area involved. To have used radar rather than eyesight where there was clear visibility and where the area involved was so restricted would have been negligent. *See Maroceano Compania Naviera S.A. v. S.S. Verdi,* 438 F.2d 854, 856 (2d Cir.1971), *cert. denied sub nom. Italia Societa di Navigazione (Italian Line) v. Maroceano Compania Naviera S.A.,* 404 U.S. 830, 92 S.Ct. 70, 30 L.Ed.2d 59 (1971).

## CONCLUSION

In summary, the Court finds that the defendant herein is not liable on the claims raised in this action. The Clerk of the Court is directed to enter judgment in conformity herewith, dismissing the complaint on the merits with costs to be taxed against plaintiffs.